AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of California

APR 2 4 2019

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                          DEPUTY

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| | ) Case No. |
| cellular telephone assigned telephone number (664) 576-6789, with International Mobile Equipment Identity ("IMEI") 865434032158896 | ) ) ) |

Case No.

**19MJ1681**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

SEE ATTACHMENT A

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 952, 960 | Importation of Controlled Substances; |
| 21 U.S.C. § 963 | Conspiracy to Import Controlled Substances |

The application is based on these facts:

SEE AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**HSI Special Agent Matthew Rhoa**
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/24/2019

_____
*Judge's signature*

City and state: San Diego, CA

**Honorable Ruben B. Brooks, U.S. Magistrate Judge**
*Printed name and title*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTACHMENT A

### *Item to be Searched*

This warrant applies to records and information associated with the cellular telephone assigned telephone number (664) 576-6789, with International Mobile Equipment Identity ("IMEI") 865434032158896 (the "Account"), that are stored at premises controlled by T-Mobile ("the Provider"), headquartered at 4 Sylvan Way, Parsippany, New Jersey 07504.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ATTACHMENT B**

*Items to be Seized*

The officer executing the warrant shall permit T-Mobile, as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

**I.    Items to be provided by the Provider**

The following information about the customers or subscribers of the Account:

i.   Names (including subscriber names, user names, and screen names);

ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii. Local and long distance telephone connection records;

iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.   Length of service (including start date) and types of service utilized;

vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

2

b. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Account, including:

    i. the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

    ii. Cell site locations and sectors for all outgoing and incoming voice, SMS, MMS, and Data transactions;

    iii. All available Timing Advance Reports, currently known as True Call, to include cell site, sector, and distance from tower, IP session and Data; and

    iv. All available Mobile Data Session and IPv6 reports.

## II.   Information to be Seized by the Government

All information described in Section I that constitutes evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 952, 960, 963, 846, and 841 and involving Leonor JARA-Bobadilla during the period of August 31 through October 17, 2018.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**AFFIDAVIT**

I, Matthew Rhoa, being duly sworn, hereby state as follows:

**INTRODUCTION**

1.     I make this affidavit in support of an application for information associated with the phone number (664) 576-6789, with International Mobile Equipment Identity ("IMEI") 865434032158896 (the "Account"), including subscriber information, telephone toll data, and cell-site geo-location information for the period of August 31, 2018 up to and including October 17, 2018. As set forth below, probable cause exists to believe that the Account contains evidence of conspiracy to import controlled substances, and importation of controlled substances, in violation of 21 U.S.C. §§ 952, 960, and 963, as well as evidence of conspiracy to distribute and possess with intent to distribute controlled substances, and possession with intent to distribute and distribution, in violation of 21 U.S.C. §§ 846 and 841.

2.     The Account is serviced principally by a communications service provider based in the Republic of Mexico; however, based on my consultation with other members of law enforcement, I understand that when phones serviced by Mexican service providers enter the United States, domestic service providers will provide service. I further understand from my communication with other members of law enforcement that the Account is serviced by T-Mobile when it is present in the United States. Based on their review of the Account, analysts with the FBI's Regional Computer Forensics Laboratory believe that the domestic service provider is either T-Mobile or AT&T; subsequently, AT&T has indicated to HSI that the Account has not had any activity on its network, an indication that the Account is not serviced by AT&T. I therefore believe that for purposes of location information in the United States, information about the Account is in the possession of T-Mobile, headquartered at 4 Sylvan Way, Parsippany, New Jersey 07504.

3.     This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require T-Mobile to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information

1

1  described in Section I of Attachment B, government-authorized persons will review the
2  information to locate items described in Section II of Attachment B.

3      4.    This Court has jurisdiction to issue this warrant because it is "a district court
4  of the United States (including a magistrate judge of such a court)" that "has jurisdiction
5  over the offense being investigated." 18 U.S.C. §§ 2703(c)(1)(A), 2711(3)(A).

6                      **EXPERIENCE AND TRAINING**

7      5.    I am a Special Agent with Homeland Security Investigations, which is a
8  component agency of the Department of Homeland Security. I have been employed as an
9  HSI Special Agent since November 2017. I am currently assigned to the HSI San Diego
10 field office in San Diego, California. My job duties are to investigate the smuggling of
11 controlled substances into the U.S. I have been cross-designated by the U.S. Drug
12 Enforcement Administration to conduct narcotics investigations and enforce provisions of
13 the Federal Controlled Substances Act, pursuant to Title 21 of the United States Code.
14 Prior to employment with HSI, I was a federal law enforcement officer with the Federal
15 Air Marshal Service, also a component of DHS. I was assigned as a Federal Air Marshal
16 from July 2010 to November 2017 at the Washington DC., Baltimore, MD, and Chicago,
17 IL field offices. Prior to my federal law enforcement career, I was a police officer in
18 Michigan certified by the Michigan Commission on Law Enforcement Standards
19 (MCOLES) from July 2000 to December 2008. I received a Master's of Science in criminal
20 justice administration and a Bachelor of Arts degree in criminal justice from the Ferris
21 State University in Big Rapids, Michigan.

22     6.    As an HSI Special Agent, my formal training consisted of six months of
23 residential instruction at the Federal Law Enforcement Training Center in Brunswick,
24 Georgia, which included training related to narcotics and dangerous drugs. I have
25 participated in training programs related to controlled substances, including but not limited
26 to marijuana, cocaine, methamphetamine, and heroin. I have also received training in the
27 methods used by narcotics traffickers to import, distribute, package and conceal controlled
28 substances. Moreover, I have participated in numerous investigations and executed arrests

2

for drug-related offenses, including possession with the intent to distribute, transportation, and the importation of controlled substances.

7.    Additionally, through the course of my duties as a Special Agent, I have talked with other experienced narcotics investigators and received informal training regarding illegal drug trends and methods of operation for multi-kilogram drug dealing and trafficking in the San Diego area.

8.    Based on my training and experience, I am familiar with the ways in which drug smugglers and traffickers conduct their business.  Indeed, during the course of my duties I have (1) worked as a case agent, directing specific drug-related investigations; (2) worked as a surveillance agent who observed and recorded movements of individuals suspected of trafficking drugs; (3) participated in the execution of search warrants related to drug investigations; (4) initiated and executed numerous arrests for drug-related offenses, including possession with the intent to distribute; and (5) interviewed criminal defendants, witnesses, and informants in furtherance of investigations into the illegal smuggling and trafficking of controlled substances.  Through these duties, I have gained a working knowledge and insight into the operational habits of drug smugglers and traffickers.

9.    The following is based on my own investigation, oral and written reports by other law enforcement officers, interviews, subpoenaed and public records, database checks, and other investigations. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I set forth only facts necessary to establish foundation for the requested search warrant application. Conversations and discussions below are set forth in substance unless noted.

## FACTS SUPPORTING PROBABLE CAUSE

10.    According to a report prepared by Customs and Border Protection Officer (CBPO) David Schiano, on October 17, 2018, at approximately 0826 hours, Schiano was conducting pre-primary inspections at the San Diego Port of Entry (SYPOE) when he approached the black 2000 Mazda MPV (the "Vehicle") bearing plates BA/MM A65NTG9

1  that JARA was driving.  CBPO Schiano used a K910B Buster Contraband Detector on the

2  rear quarter panel on the driver side of the Vehicle and received a high reading.  CBPO

3  Schiano began a cursory inspection of the Vehicle and received high Buster readings when

4  checking the inside of the driver-side quarter panel, which CBPO Schiano opened with a

5  screwdriver and observed packages wrapped in cellophane.

6       11.    According to a report prepared by CBPO Nicholas Pernicano, a secondary

7  inspection of the Vehicle's quarter panels, doors, and dashboard revealed about 74

8  packages weighing 37.30 kilograms, which field-tested positive for methamphetamine; 20

9  packages weighing 24.04 kilograms, which field-tested positive for cocaine; and 5

10 packages weighing 5.84 kilograms, which field-tested positive for heroin.

11      12.    On October 17, 2018, at approximately 9:21 a.m., I was notified of the drug

12 seizure and responded to the SYPOE, where JARA, the Vehicle, methamphetamine,

13 cocaine, heroin, and her phone were being held for further processing.  JARA's phone was

14 seized by CBPO Pernicano and was provided to me.  At approximately 12:46 p.m., I made

15 contact with JARA at the SYPOE.  During her post-*Miranda* interview, JARA identified

16 the phone as hers; the Account is connected with this phone.[1]

17      13.    On October 17, 2018, I interviewed JARA, and she denied knowledge of the

18 narcotics in the Vehicle.  She said she had responded to an advertisement in a newspaper

19 and had been contacted by a man named Alfredo GARCIA.  JARA said that GARCIA

20 arranged for the Vehicle to be registered in her name and that GARCIA would provide the

21 Vehicle to her when she crossed into the United States.  JARA said she would drive the

22 Vehicle into the United States and purchase about $20 worth of cleaning supplies and then

23 return to Mexico and deliver the Vehicle back to GARCIA.  JARA said when she drove

24 the Vehicle into the United States, she would park the Vehicle in a parking lot close to the

25 international border and then call GARCIA to tell him where the vehicle was

26

27 [1] A logical extraction of the contents of JARA's phone was performed using the Cellebrite

28 machine at the port of entry.  None of those contents are relied upon for purposes of
   establishing probable cause in this affidavit.

1  parked. JARA then said she would leave the vehicle and go shopping, initially stating only
2  at the ".99 cent" store, but later stating that she would go grocery shopping or to church
3  and that she would be away from the Vehicle for several hours. JARA said she would then
4  call GARCIA before returning to the Vehicle. JARA said she was paid $100 in cash for
5  each trip.

6       14.    As noted, JARA said in her interview that she had responded to an
7  advertisement in a newspaper and been contacted by GARCIA. Subsequently, JARA
8  provided an electronic copy of the advertisement, which is dated August 13, 2018. Call
9  histories from JARA's phone show that the phone had a communication with the phone
10  number listed on the advertisement on August 14, 2018.

11       15.    During my search of JARA's phone pursuant to two search warrants (19-MJ-
12  023 & 19-MJ-1444 (S.D. Cal.)), I found that on July 31, 2018 and August 8, 2018, JARA
13  missed two calls from a phone number saved to the contact "Alfred G." After August 13,
14  2018, JARA tried to call this number at least one time, and had at least one conversation
15  with the user of that number. I also note from my search that she had communications with
16  contacts saved as "Alfredo," "Alfredo Gcia," "Alfredo G," and "Alfredito G." These
17  appear to me to be variations on the name "Alfredo Garcia," and so I believe that before
18  August 13, 2018, JARA had at least two attempted phone communications with GARCIA.

19       16.    I have reviewed information about JARA's border-crossing activity and her
20  call activity using her phone. JARA entered the United States, using the Vehicle on August
21  31, on September 2, 5, 8, 13, 16, 18, 20, 23, 30, and on October 7, 10, 13, and 17.
22  Comparing these crossing records to JARA's phone records shows that JARA had at least
23  one communication or attempted communication with GARCIA on August 31, on every
24  day of September except the 1st and the 27th, and on every day between October 1st and
25  17th except for October 8th. In other words, JARA was in regular communication with
26  GARCIA in September and October 2018, the same time period she was crossing the
27  Vehicle into the United States.

28       17.    Based upon the foregoing and my experience and investigation in this case,

there is probable cause to believe that JARA, as well as other persons currently unknown, were involved in an ongoing conspiracy to import and transport federally controlled substances. Further, there is probable cause to believe that JARA coordinated with coconspirators regarding the importation, transportation, and distribution federally controlled substances, and to otherwise further this conspiracy both inside and outside of the United States, and used her phone in connection with those efforts.

18.     Based upon my experience investigating drug smuggling, my training, and my consultation with other investigators who have experience investigating drug smuggling in near the border, I understand that drug smugglers will seek to smuggle drugs from Mexico to the United States by hiding the drugs in hidden compartments of cars, and in non-factory compartments (*i.e.*, compartments that the manufacturer did not design for ordinary use). Smugglers will then drive north from Mexico and seek to pass through POEs with the drugs undetected. I am also aware that such individuals will sometimes try to generate a history of crossings to show that driving through a POE is ordinary behavior for them. When they arrive in the United States, smugglers will take the drugs to a discreet location to transfer them to other people involved in the distribution chain, who can then send the drugs to other locations for downstream distribution. Location information, such as the requested Account information, can demonstrate the movement of these individuals in connection with their courier activity.

19.     Based upon my training and experience as a Special Agent, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I further submit the following:

   a. Drug smugglers use cellular telephones because the devices are mobile and provide instant access to telephone calls, texts, internet, application-based communications platforms (*e.g.*, WhatsApp), and voice messages;

   b. Drug smugglers use cellular telephones because they are able to actively monitor the progress of the illegal cargo while the conveyance is in transit;

   c. Drug smugglers and their accomplices use cellular telephones because the

phones help them arrange for the delivery of cargo at predetermined locations and monitor / plan for arrival times;

d. Drug smugglers use cellular telephones to direct couriers to synchronize drop off and pick up times of the illegal cargo;

e. Drug smugglers use cellular telephones to notify or warn accomplices about law-enforcement activity, such as the presence and posture of marked and perceived unmarked patrol vehicles, or the operational status of border checkpoints and border crossings;

f. The use of cellular telephones by smugglers tends to generate evidence stored on the cellular telephones, including but not limited to emails, text messages, application-based communications, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data; and

g. Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular telephone subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

20.   Given the facts surrounding JARA's arrest, my review of JARA's border-crossing activity prior to her arrest, and based upon my experience and training, as well as consultation with other law enforcement officers experienced in drug smuggling investigations, I submit that there is probable cause to believe JARA used the phone associated with the Account, and that information relevant to the smuggling activities of JARA will be found in a review of the Account. Based on the foregoing and in light of my training and experience, I further submit that there is probable cause to authorize a review of the Account for the time period that it appears JARA and GARCIA were in regular communication in conjunction with her crossings, *i.e.*, from August 31 to October 17, 2018.

21.     In my training and experience, I have learned that T-Mobile is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

22.     Based on my training and experience, I know that T-Mobile can collect cell-site data about phones, including information constituting the Account.  I also know that wireless providers such as T-Mobile typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

23.     Based on my training and experience, I know that wireless providers such as T-Mobile typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the methods of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service.  I also know that wireless providers such as T-Mobile typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.  In my training and experience, this information may

8

1   constitute evidence of the crimes under investigation because the information can be used
2   to identify the user or users of the phone associated with the Account, and may assist in the
3   identification of co-conspirators.

**CONCLUSION**

5   24.    Based on the foregoing, I request that the Court issue the proposed search
6   warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

7   25.    Based upon my training and experience, consultation with other law
8   enforcement officers experienced in extortion investigations, and all the facts and opinions
9   set forth in this Affidavit, there is probable cause to believe that the Account to be seized,
10  as set forth above and in Section I of Attachment B, will be found in the location described
11  in Attachment A, and will contain evidence of violations of 21 U.S.C. §§ 952, 960, 963,
12  846, and 841. Therefore, I respectfully request that the Court issue a warrant authorizing
13  me, or another federal law enforcement agent, to order T-Mobile to search its corporate
14  records for the Account and to order T-Mobile to deliver the Account listed in Section I of
15  Attachment B.

16  I swear the foregoing is true and correct to the best of my knowledge and belief.

Matthew Rhoa
HSI Special Agent

21  Subscribed and sworn to before me this 24th day of April, 2019.

The Honorable Ruben B. Brooks
United States Magistrate Judge

9